**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **EMERALD COAST FINEST PRODUCE CO., INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 06-742C** |
| | ) | **(Judge Emily C. Hewitt)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MILITARY PRODUCE GROUP, LLC** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |

**DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFF'S REVISED MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND REVISED CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**DANIEL R. WECKSTEIN**

**Vandeventer Black, LLP**
**500 World Trade Center**
**101 W. Main Street, Suite 500**
**Norfolk, VA 23510**
**Attorney of record for Defendant-Intervenor,**
**Military Produce Group, LLC**

**OF COUNSEL:**

**WALTER B. MARTIN**
**STEPHANIE M. HIMEL-NELSON**

**Vandeventer Black, LLP**
**500 World Trade Center**
**101 W. Main Street, Suite 500**
**Norfolk, VA 23510**

June 25, 2007

**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

# Table of Contents

**Table of Contents** ........ 2

**Table of Authorities** ........ 3

**Questions Involved** ........ 4

**Statement of Facts** ........ 4

**Argument** ........ 4

**I. The Evaluation was Reasonable and Consistent** ........ 4

**A. The Quality Program Sub-Factor Re-Score Was Reasonable** ........ 6

1. Emerald erroneously assumes that only the issue of USDA inspectors affected its score. ........ 6

**B. The Re-evaluation of Production Capabilities/Distribution Plan Was Reasonable** 8

1. No undisclosed evaluation factor was used. ........ 8

2. Emerald's Production Capabilities/Distribution plan was deficient in other ways. . 10

**C. The Re-Assessments Were Rational and Reasonable** ........ 12

**II. Emerald Has Not Met the Standard for Injunctive Relief** ........ 13

**Conclusion** ........ 13

**Certificate of Service** ........ 15

**Protected Information has been Redacted**

# Table of Authorities

**Statutes**

28 U.S.C. § 1491(b)(4) .......... 4

5 U.S.C. § 706(2)(A).......... 4

**Cases**

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12 (1987).......... 13

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87 (1983).......... 4

Banknote Corp. of America, Inc., 56 Fed. Cl. 377, 380-81 (2003) .......... 13

Beta Analytics Int'l., Inc. v. United States, 44 Fed. Cl. 131, 137 n.10 (1999).......... 13

CACI Field Servs., Inc. v. United States, 13 Cl. Ct. 718 (1987), aff'd, 854 F.2d 464 (Fed.Cir.1988).......... 9

CACI, Inc.-Federal v. United States, 719 F.2d 1567 (Fed. Cir. 1983) .......... 4

Galen Medical Assocs., Inc. v. United States, 56 Fed. Cl. 104, 108 (2003).......... 4, 5, 12

Gulf Group, Inc. v. United States, 56 Fed. Cl. 391 (2003) .......... 4

Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448 (1997).......... 9

Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002) .. 13

Impresa Construzioni v. United States, 238 F.3d 1324, 1332 (2001).......... 13

Information Sciences Corp. v. United States, 73 Fed. Cl. 70 (2006).......... 4

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29 (1983) .......... 5

Omega World Travel v. United States, 54 Fed. Cl. 570 (2002) .......... 4, 5

OTI Am., Inc. v. United States, 68 Fed. Cl. 646 (2005).......... 5

Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533 (2003).......... 4

## Questions Involved

I. Whether the Agency's decision to award the Contract to MPG was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

II. Whether Emerald has demonstrated a right to injunctive relief.

## Statement of Facts

MPG refers the Court to its Statement of Facts filed with this Motion and incorporated herein.

## Argument

### I. The Evaluation was Reasonable and Consistent

The standard of review in a post-award bid protest is narrow and deferential. The Court may only set aside an award if the Agency's actions were arbitrary, capricious, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A) (2006); see also 28 U.S.C. § 1491(b)(4) (2006); see, e.g., Galen Medical Assocs., Inc. v. United States, 56 Fed. Cl. 104, 108 (2003); aff'd, 369 F.3d 1324 (Fed. Cir. 2004); Omega World Travel v. United States, 54 Fed. Cl. 570, 574 (2002). The "arbitrary and capricious" standard requires only that the final decision reached by an Agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983); see also Software Testing Solutions, Inc. v. United States, 58 Fed. Cl. 533, 538 (2003); Gulf Group, Inc. v. United States, 56 Fed. Cl. 391, 396 (2003). "Only in extremely limited circumstances" will the Court interfere with the government procurement process. See Information Sciences Corp. v. United States, 73 Fed. Cl. 70, 96 (2006); CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983).

The plaintiff has the burden to show that, but for the alleged error in the procurement, it likely would have been awarded the contract. See Galen Medical Assocs., Inc. v. United States, 56 Fed. Cl. at 108; Omega World Travel, 54 Fed. Cl. at 574. Moreover, a protestor's burden is higher for a negotiated procurement because the contracting officer has broad discretion when engaging in an inherently judgmental process. Galen Medical Assocs., Inc., 56 Fed. Cl. at 108.

The Agency need only provide a "coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." See id. at 1333. An Agency decision lacks a coherent and reasonable explanation only "if the agency... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983); see also OTI Am., Inc. v. United States, 68 Fed. Cl. 646, 653 (2005) (applying this test to a bid-protest action).

Here, the Agency's decision was clear, consistent, and well documented. Emerald's assertions to the contrary, MPG is the highly experienced, well-qualified contractor that actually pioneered the new commercial based Fresh Fruits and Vegetables ("FF&V") program that DeCA has chosen as a model for future procurement.[1] The Agency did not use undisclosed evaluation factors. Rather, the Agency evaluated the proposals equally and consistently based on the evaluation factors stated in the solicitation. As the source selection documents clearly indicate, Emerald's Quality Program and Production Capability/Distribution Plans, while meeting minimum Agency requirements, simply were not as detailed or extensive as MPG's plans. As a result, the Agency properly determined that MPG provided the best value for the Contract.

**A. The Quality Program Sub-Factor Re-Score Was Reasonable**

The re-scoring of the Quality Program Sub-Factor was reasonable. MPG offered a far more detailed quality program than Emerald and Emerald's provides no support for its allegation that Emerald's USDA certifications are somehow better than MPG's.

Emerald essentially argues that DeCA improperly scored this sub-factor by erroneously scoring Emerald as if it had no on-site USDA inspectors and by erroneously giving MPG credit for on-site USDA inspectors. Once again, Emerald ignores and mischaracterizes portions of the Administrative Record.

1. Emerald erroneously assumes that only the issue of USDA inspectors affected its score.

MPG received an exceptional rating for its Quality Program, while Emerald received a satisfactory rating. AR02211. While Amendment 0005 to the Solicitation did add a requirement for on-site inspection and certification by USDA inspectors, it was not the only requirement under the Quality Program sub-factor. Rather, the solicitation stated:

> (1) **Describe, in detail,** your quality control program and quality assurance procedures. Include in your narrative, your plan as it relates to food safety, product recall procedures, sanitation, pest management, and types of safeguard measures taken to assure the integrity and product security of the food supply provided to the patrons of the commissaries. Discuss who is responsible for resolving quality problems and the methodology used.
>
> (2) **Discuss, in detail,** your company's backup plan in the event that food safety issues arise. Include any plans for alternate sources of supply in the case of food safety issues.
>
> (3) **Describe, in detail,** the methodology used in your quality program that ensures the stability of the products in order to deliver produce of the highest quality and freshness. Include how your firm works with USDA inspectors to ensure that product is

[1] See Defendant-Intervenor's Counter-Statement of Facts Number 2, 6, 7, filed December 19, 2006.

> inspected, received, stored, staged, and shipped correctly.
>
> (4) **Describe** your firm's inspection procedures used to ensure that the produce delivered meets the grade and quality standards. Include your firm's procedures used in buying produce from suppliers to achieve produce of consistent high quality, appearance, grade, yield, taste, texture, etc.

AR00598-99 (emphasis in original). Clearly, USDA inspectors were only a portion of the requirements for the Quality Program sub-factor.

In its re-evaluation, as in its original evaluation, the TEB noted problems with Emerald's quality program:

> Emerald provided adequate details regarding food safety concerns but the inspection of products and quality issues indicates a reliance on their Receiving Manager without providing information about any backups or other personnel that would be available in this person's absence or could otherwise lead to disruption in distribution to the commissaries.

AR02211. The TEB also noted:

> Limited specific details of procedures in place made it difficult to assess Emerald's Quality Program as more than satisfactory. […] Emerald's Quality Program is established and appears to be adequate for the requirements however more specific details regarding their procedures utilized would have given a clearer/better viewpoint of their program's capacity.

AR02211.

In contrast, the TEB noted that MPG's proposal provided specific details regarding its Quality Program and "was determined to have a very strong program […] in the areas of product recall, security, warehouse sanitation, and pest management. […] MPG fully explained their product recall process that was excellent… There were sufficient details provided that there are backup personnel to minimize any disruption in distribution to the stores." Id.

Emerald also mischaracterizes the administrative record in an attempt to bolster its

argument. It argues that its own proposal to place USDA inspectors on-site for 60 hours is somehow superior to MPG's 40 hours of on-site USDA inspection. However, the TEB also noted that MPG included "frequent USDA inspections of products utilizing USDA and company trained QA inspectors daily *prior to the mandatory requirement by DeCA*." AR02211 (emphasis added.) Emerald added its on-site USDA inspections only after DeCA added the requirement to the solicitation. When Emerald finally did add on-site USDA inspection to its proposal, it indicated that it "estimated" 60 hours of on-site inspection would be needed. However, the hours estimated are irrelevant. Amendment 0005 does not require an "estimate" of the USDA inspection hours needed, rather the amendment simply requires that all products delivered to the commissaries be USDA certified. AR00714. MPG, having already incorporated on-site USDA inspection into its Quality Program, was in a far better position to know exactly how many hours a USDA inspector was needed than Emerald, who clearly had not already implemented the use of USDA inspectors on-site. Clearly, there was a rational basis for the TEB's determination that MPG's Quality Program was significantly better than Emerald's.

**B. The Re-evaluation of Production Capabilities/Distribution Plan Was Reasonable**

Emerald also argues that its re-scoring on the Production Capabilities/Distribution Plan was "wrongly premised." Emerald again argues that the agency treated the start-up period for the contract as an undisclosed evaluation factor and argues that it should not have been downgraded for proposing a 60-day start-up period after contract award.

1. No undisclosed evaluation factor was used.

Contrary to Emerald's assertions, DeCA did not use an undisclosed evaluation factor to downgrade Emerald. The Agency noted Emerald's request for 60 days start-up time when the

solicitation clearly stated that performance would commence 30 days after contract award. AR00599. To show entitlement to relief on a claim that an Agency used undisclosed evaluation factors, however, Emerald must prove that the government evaluated the proposals received on a significantly different basis than announced in the solicitation and that Emerald was prejudiced as a result. See Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448, 471 (1997); CACI Field Servs., Inc. v. United States, 13 Cl. Ct. 718, 728 (1987), aff'd, 854 F.2d 464 (Fed.Cir.1988).

The solicitation at issue here clearly indicated that contract performance would commence 30 days after award. It stated:

> Provide the length of time that your firm will need from notification of award to the start of contract performance, if your firm's proposal is determined to be the best value to the Government for contract award. The period of performance as stated in this solicitation will commence approximately 30 calendar days after notification of contract award (or a date as specified by the Contracting Officer); however, the offeror may propose an alternative time frame for consideration.

AR00599. It is clear from the Solicitation that an offeror could propose an alternative to the 30 days, but it also clear that DeCA was not required to accord it the same weight as an offer to comply with the Agency's need to start Contract performance within 30 days.

In further discussions, the Agency requested clarification regarding why Emerald needed 60 days. Emerald's need for the additional time to hire 45 new employees and purchase significant amounts of new equipment raised concerns with the TEB. It noted that the 60 day start-up

> […] raised concerns with Emerald's proposal for this sub-factor because if unforeseen delays prevented the acquisition of the necessary additional people or trucks, the commissaries may be adversely affected and DeCA would have to find alternate source [sic] to supply commissaries. […] Emerald's proposal provided a general overview of their production/distribution capability. It is likely they could perform the contract if awarded the contract but

> only after an extended startup period – assuming no unexpected delays. MPG's proposal provided a more detailed approach to demonstrate their production/distribution capabilities for contract performance that could be implemented within the required timeframe if awarded the contract. As such, MPG received a very good rating for this sub-factor and Emerald received a satisfactory rating for this sub-factor.

AR02212.

Emerald's argument seems to be that if the Solicitation does not specifically state that "failure to comply with the requirements can be considered in scoring or risk assessment," then the Agency cannot consider such a factor. This is neither logical nor practical. When an offeror proposes other than what is required or suggested by the Solicitation, the offeror clearly takes the risk that such a proposal will not be optimally scored. In this case, it would be illogical to assume that a proposal with a shorter start-up period could not be scored higher than one with a longer start-up period. The Solicitation merely states that this is an area where alternatives may be proposed. For example, if the offeror proposed a shorter time frame, the Agency could increase its scoring. Given that the purpose of the contract is to cut costs and increase services related to the supply of produce, it seems inconceivable that the offeror would not understand that a failure to meet DeCA's time frame could result in a lower score. Clearly, it was perfectly reasonable for the Agency to determine that a more highly rated offer with a 30 day start-up period was a better value than Emerald's lower rated proposal with a 60 day start-up period.

2. <u>Emerald's Production Capabilities/Distribution plan was deficient in other ways.</u>

Emerald's proposed extended start-up period was not by any means the only deficiency noted in Emerald's Production Capabilities/Distribution plan. Rather, the Agency also noted that Emerald again failed to provide the detail necessary to rate its plan higher:

> While Emerald states how much produce passes through their

> facilities[,] little detail was provided to provide better insight of their suppliers, what type of agreements they have with them or what time frame. There was a brief and limited overview given to describe the product rotation, emergency contingency plans for mechanical equipment or disruption in their supply chain, and handling out-of-cycle orders. Additional details regarding their procedures would have provided a clearer/better demonstration of their capability for this sub-factor.

AR02212. Emerald received [ ] out of [ ] points for this subfactor. In contrast, MPG received [ ] points for this Subfactor. However, the TEB noted that MPG:

> [
>
> .]

AR02211-12. The TEB also noted that MPG has:

> [
>
> .]

AR02212.

Although the Agency did not use the 30 day start-up period as an undisclosed evaluation factor, even if it had, at worst this is a "harmless error." Emerald cannot show that it would have

won the award but for the assessment of its start-up period. Rather, Emerald's numerous other technical deficiencies, particularly when compared to MPG's "Exceptional" evaluation, would have precluded an award to Emerald.

### C. The Re-Assessments Were Rational and Reasonable

Next, Emerald argues that the TEB's re-scoring and the Contracting Officer's revised decision were simply a pretext for again awarding the contract to MPG. The scores following re-evaluation of the Technical Proposals are as follows:

| **Company** | **Experience** | **Quality Program** | **Production Operation/Distribution Plan** | **Additional Support/Promotion Plan** | **Total Technical Capability Score** |
|---|---|---|---|---|---|
| MPG | [ ] | [ ] | [ ] | [ ] | **[ ]** |
| Emerald | [ ] | [ ] | [ ] | [ ] | **[ ]** |
| Pro*Act | [ ] | [ ] | [ ] | [ ] | **[ ]** |

AR02210-26 (Pro*Act scoring at AR02025, from original TEB evaluation). The government, however, is presumed to act in good faith absent "well-nigh irrefragable proof" that the government intended to injure the protestor. Galen Medical Assocs., Inc., 56 Fed. Cl. at 108. Yet, Emerald provides no support for its argument, aside from rehashing its contentions regarding the Quality Plan and Production Capabilities/Distribution Plan sub-factors.

Moreover, no rational trade-off analysis could have awarded the Contract to Emerald. Emerald was simply not next in line for award. Rather, both MPG and Pro*Act (in the initial evaluation) received technical evaluation scores significantly higher than Emerald's. While MPG's proposed percentage of patron savings was slightly lower than MPG's, Pro*Act's was identical at [ ]. The Solicitation clearly indicated that the technical evaluation was significantly more important than price. There was clearly no rational justification of Emerald's

**Protected Information has been Redacted**

shortcomings that would have warranted an award to Emerald. Emerald's protest does not challenge Pro*Act's higher technical score.

## II. Emerald Has Not Met the Standard for Injunctive Relief

Injunctive relief is relatively drastic in nature. Therefore, a plaintiff must demonstrate that its right to such relief is clear. See Impresa Construzioni v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001); Banknote Corp. of America, Inc., 56 Fed. Cl. 377, 380-81 (2003); cf. Beta Analytics Int'l., Inc. v. United States, 44 Fed. Cl. 131, 137 n.10 (1999). An injunction generally will not be granted unless the Court first finds the applicant has a probability of success on the merits of its claim, meaning "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F. 3d at 1332. Here, the Contracting Officer's decision was patently rationally and reasonably based and Emerald can show no material violation of the terms of the Solicitation, applicable regulations, or the selection procedure. Clearly, as detailed above, Emerald has no probability of success on the merits.

After considering the probability of success on the merits of the claim, the Court must consider: (1) the balance of hardships if an injunction is granted; (2) irreparable injury to plaintiff absent an injunction; and (3) the public interest. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n. 12 (1987); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002). Here, the balance of possible hardships clearly weighs against Emerald. MPG has been performing this contract since October of 2006. MPG has ramped up the employees and equipment necessary to support the contract, and has put its ordering system in place. Moreover, commissary personnel are now used to MPG's ordering system and MPG's

personnel, support, and assistance. A disruption of the Contract would result in disruption of the supply of fresh fruits and vegetables at Area 5, Group 1 commissaries. Moreover, Emerald has made no showing that it would be irreparably harmed absent an injunction. If there has been no violation of the terms of the Solicitation, applicable regulations, or the selection procedure, an injunction is clearly not in the public's interest. Because Emerald has no probability of success and the balance of hardships weighs in MPG's favor, Emerald is not entitled to injunctive relief.

## Conclusion

For all of the reasons set forth in the foregoing Brief in Opposition of Plaintiff's Revised Motion for Judgment on the Administrative Record and Revised Cross-Motion for Judgment on the Administrative Record, MPG respectfully requests that the Court enter Judgment for the Defendant and Defendant-Intervenor on this Administrative Record.

Respectfully Submitted,

MILITARY PRODUCE GROUP, LLC

By: ______/s/__________________________
Daniel R. Weckstein (Va. State Bar No. 17741)
VANDEVENTER BLACK LLP
500 World Trade Center
Norfolk, VA 23510-1699
(757) 446-8600
Facsimile: (757) 446-8670
E-mail: dweckstein@vanblk.com

Of counsel

Walter B. Martin (Va. State Bar No. 4214)
Stephanie M. Himel-Nelson (Va. State Bar No. 46966)
VANDEVENTER BLACK LLP
500 World Trade Center
Norfolk, VA 23510-1699
(757) 446-8600

Facsimile: (757) 446-8670
Email : wmartin@vanblk.com
shimelnelson@vanblk.com

**Certificate of Service**

I hereby certify that a true copy of the foregoing pleading was sent by E-Mail transmission this 25th day of June, 2007 to counsel herein as follows:

Cyrus E. Phillips, IV, counsel for Emerald Coast, at lawyer@procurement-lawyer.com

Leslie Ohta, Esquire, counsel for Defense Commissary Agency, at Leslie.Ohta@usdoj.gov

Elliott Clark, Esquire, Assistant General Counsel for Defense Commissary Agency at Elliot.clark@deca.mil

By:______________/s/__________________
Daniel R. Weckstein