# BUSINESS ASSETS PURCHASE AGREEMENT

THIS AGREEMENT made and entered into as of the 2nd day of June, 2007, by and between **ADAMS BROTHERS PRODUCE COMPANY, INC.**, a corporation organized under the laws of the State of Delaware **(hereinafter referred to as "Buyer")**, **EMERALD COAST FINEST PRODUCE COMPANY, INC.**, a corporation organized under the laws of the State of Florida (hereinafter referred to as "Seller"), and **PRESTON THOMPSON**, and **CONNIE THOMPSON**, both of whom are individual residents of the State of Florida and the shareholders of Seller ("Shareholders"), as follows:

WITNESSETH:

WHEREAS, Seller is in the business of owning and operating a produce business in Pensacola, Florida, ("Emerald Coast Finest Produce"), and;

WHEREAS, Seller and Shareholders desire to sell to Buyer, and Buyer desires to buy from Seller, all of the assets used and/or usable by Seller in Emerald Coast Finest Produce, except for those assets specifically listed on Exhibit A; and

WHEREAS, both Buyer and Seller further desire to enter into this written agreement setting forth all warranties, covenants and conditions in connection with the purchase and sale of the aforesaid assets;

NOW, THEREFORE, for and in consideration of the mutually dependent covenants and agreements contained herein, Buyer and Seller agree as follows:

1. **Definitions**. As used herein, the following terms shall have the following meanings:

1.1 **Accounts Receivable**: "Accounts Receivable" shall mean the accounts receivable of Seller as shown by its books and records of account, as of the Closing Date.

1.2 **Business**: "Business" shall mean the business currently being conducted by Seller with the Business Assets and all activities related to these endeavors.

1.3 **Business Assets**: "Business Assets" shall mean the Contracts, Goodwill, Inventory, Leases, and Personal Property (all as hereinafter defined), and shall include any intangibles of Seller, which are to be sold to Buyer hereunder.

1.4 **Contracts**: "Contracts" shall mean the contracts and agreements listed on the attached Schedule 1.4.

1.5 **Goodwill**: "Goodwill" shall mean the goodwill that Seller has developed and gained in connection with the operation of Emerald Coast Finest Produce.

1.6 **Inventory**: "Inventory" shall mean the saleable in-date inventory of Seller's produce at Closing to be taken by a person or persons selected by Seller and Buyer, between now and the Closing Date, and to be attached hereto as Schedule 1.6.

1.7 **Leases**: "Leases" shall mean the leases listed on the attached Schedule 1.7.

1.8 **Licenses and Permits**: "Licenses and Permits" shall mean the licenses, permits, or other authorizations (and all of Seller's prepaid obligations thereunder) issued to Seller by any federal, state, local, or other governmental authority, or issued to Seller by parties other than federal, state, local, or other governments, all as listed on the attached Schedule 1.8.

1.9 **Liabilities**: "Liabilities" shall mean the liabilities listed on the attached Schedule 1.9.

1.10 **Personal Property**: "Personal Property" shall mean all of the telephones, supplies, materials, tools, machinery, equipment, furniture, fixtures and other personal property of Seller, including, without limitation, the property listed on Schedule 1.10, and all of the personal property acquired by Seller in the ordinary course of business between the date of this Agreement and the Closing, except for those assets specifically listed on Exhibit A.

1.11 **Real Estate Lease and Purchase Agreement**: "Real Estate Lease and Purchase Agreement" shall mean a lease from Seller to Buyer for the premises out of which Seller operates its business (the "Real Estate") and an agreement for Buyer to purchase and Seller to sell said premises at the conclusion of the lease term, all in the form attached hereto as Exhibit B.

2. **Purchase and Sale of Business Assets**. Subject to the conditions and terms set forth herein, on the Closing Date at closing, Buyer will purchase from Seller, and Seller will sell, assign, transfer, convey, and set over unto Buyer all of the assets used and/or usable by Seller in the operation of its Business and owned by Seller at the Closing Date (except for those assets specifically listed on Exhibit A) which assets constitute the Business Assets including, without limitation, the following:

2.1 **Contracts**: all of Seller's rights under the Contracts, by Assignment of Contracts in a form acceptable to Buyer.

2.2 **Goodwill**: the Goodwill of Seller by Bill or Bills of Sale in form acceptable to Buyer.

2.3 **Inventory**: full and absolute title to the Inventory by Bill or Bills of Sale in a form acceptable to Buyer.

2.4 **Leases**: all of Seller's rights under the Leases, by Assignment of Leases in a form acceptable to Buyer.

2.5 **Licenses and Permits**: all of Seller's rights under the Licenses and Permits, to the extent assignable, by Assignment of Licenses and Permits in a form acceptable to Buyer.

2.6 **Personal Property**: full and absolute title to the Personal Property by Bill or Bills of Sale in a form acceptable to Buyer, including, without limitation, the above-ground storage tanks of Seller.

3. **Purchase Price: Terms of Payment**.

3.1 **Consideration**. As consideration for the Business Assets transferred to Buyer hereunder, Buyer shall pay Seller $1,020,000, plus the value of the Inventory as reflected in the books and records of Seller at Closing (the "Consideration"). An amount equal to the said value of the Inventory shall be paid within 30 days of Closing. The $1,020,000 balance of the Consideration shall

be paid as follows: (i) $20,000 in cash at Closing; (ii) $450,000 in cash payable promptly upon the release of the existing liens on the Business Assets held by Beach Community Bank, the Bank of Pensacola, Textron Financial Corporation and Regions Bank (the "Asset Liens") and (iii) $550,000 through a promissory note, the terms of which are described in Section 3.2 (the "Promissory Note"). In the event any of the Asset Liens are not released within 30 days of Closing, Buyer shall have the right to pay the amounts due to those lienholders directly on behalf of Seller and to reduce, by the amount paid by Buyer to said lienholders on behalf of Seller: first, the amount of cash due to Seller under this Section 3.1; second, if necessary, any rent due to Seller under the Real Estate Lease and Purchase Agreement; third, if necessary, the balance due on the Promissory Note; and fourth, if necessary, any other obligation owed by Buyer to Seller. Also, in the event Seller has not, prior to the time the $450,000 cash payment is due to the made to Seller, paid to Navistar Financial Corporation the monthly payments currently in arrears on that debt, over and above the $412,000 of the current note due to Navistar. Buyer will have the right to pay directly to Navistar Financial Corporation for the benefit of Seller the payments still in arrears and to reduce the payments due from Buyer to Seller in the same manner set forth in the preceding sentence.

3.2 **Promissory Note.** The Promissory Note in the amount of $550,000 to be issued at closing shall be payable, based on a 10-year amortization schedule, in equal monthly installments of principal and interest with interest at 6%, beginning on July 1, 2007 with the entire remaining balance of principal and interest due at the end of the third year, and shall be in the form attached hereto as Exhibit C.

3.3 **Allocation of Purchase Price.** Buyer and Seller agree that the Purchase Price and the liabilities of the Company will be allocated to the assets of the Company for all purposes including tax and financial accounting as shown on Schedule 3.33 attached hereto. The parties will file all income tax returns (including amended tax returns and claims for refund) and information reports in a manner consistent with such values.

3.4 **Liabilities.** Buyer is assuming no liabilities of Seller or Shareholder other than the Liabilities on Schedule 1.9.

4. Closing. The closing (the "Closing") shall take place on May 31, 2007 (the "Closing Date"), at a mutually agreeable location. At the Closing, to the extent the parties have not previously delivered the following items, Seller and Buyer shall deliver the following items to each other:

4.1 **Seller's and Shareholder's Closing Items**: Seller and Shareholder shall deliver to Buyer:

(a) Executed Assignment of Contracts.

(b) Executed Bill of Sale for Inventory.

(c) Executed Assignments of Leases.

(d) Executed Bill or Bills of Sale for the Personal Property.

(e) Where necessary, written consents to the Assignments of the Leases hereafter referred to in Section 7.4 "Conditions to Buyer's Obligations".

(f) Where necessary, written consents to the Assignments of Contracts hereafter referred to in Section 7.5 "Conditions to Buyer's Obligations".

(g) Where necessary, written consents to the Assignments of Licenses and Permits hereafter referred to in Section 7.6 "Conditions to Buyer's Obligations".

(h) The Seller's Certificate hereafter referred to in Section 7.8 "Conditions to Buyer's Obligations".

(i) The certified copy of Shareholders' and Directors' resolutions hereafter referred to in Section 7.9 "Conditions to Buyer's Obligations".

(j) The books and records hereafter referred to in Section 7.10 "Conditions to Buyer's Obligations".

(k) Executed Real Estate Lease and Purchase Agreement.

4.2 **Buyer's Closing Items**: Buyer shall deliver to Seller:

(a) The Promissory Note.

(b) Executed Real Estate Lease and Purchase Agreement for the real property out of which Emerald Coast Finest Produce currently operates on mutually satisfactory terms.

5. **Warranties of Seller and Shareholder**. Seller and Shareholders represent and warrant, without reservation, jointly and severally, such representations and warranties to continue to and survive the Closing Date, as follows:

5.1 **Organization and Good Standing**. Seller is a corporation duly organized and in good standing under the laws of the State of Florida, and is in good standing in and duly qualified to do business in and under the laws of all other states in which the nature of its business requires that the Seller be so qualified and in good standing.

5.2 **Authorization**. Seller is legally authorized to execute and perform its obligations under this Agreement, and the execution of this Agreement and the performance of Seller's obligations hereunder have been duly authorized by Seller's Shareholders and Board of Directors, and no further authorization is necessary; and there are no provisions of any law, federal, state, or local, or of Seller's certificate of incorporation or bylaws, nor is Seller a party to any existing contracts or agreements whatsoever, which could in any way bar or impede Seller from executing this Agreement and performing its obligations hereunder.

5.3 **Financial Information**. Sellers have delivered to Buyer the following financial statements: unaudited balance sheet of the Company as of December 31, 2006 (the "Balance Sheet"). Such Balance Sheet is correct and complete in all material respects, are consistent with the books and records of the Seller and fairly present the financial condition of the Seller as of December 31, 2006 in accordance with GAAP, applied on a consistent basis. The information provided by Seller to Buyer as to revenues of Seller as set forth on Schedule 5.3 is correct and accurate.

5.4 **Ownership of Assets and Absence of Liabilities**. The Seller is the owner of and possesses good title to all the Business Assets being purchased and the Real Estate. Seller

does not have knowledge of any fact or facts which would require Seller to set up any reserve in respect of any obligations or liabilities.

5.5 **Title to Personal Property**. Seller has good and marketable title to all of the Personal Property, free and clear of all liens, encumbrances and claims, and the Personal Property is all of the personal property used by the Seller in the conduct of the Business as currently conducted (except the liens held by Beach Community Bank, the Bank of Pensacola, Regions Bank, Textron Financial Corporation and Navistar Financial Corporation, as previously disclosed to Buyer); and the Personal Property is, and will be at the Closing Date, in good working condition, and fit for the purpose of conducting the Business. The liens held by Beach Community Bank, the Bank of Pensacola, Regions Bank and Textron Financial Corporation will be caused by Seller to be satisfied and released within 30 days of Closing at Seller's expense.

5.6 **Payment of Taxes**. Seller has paid or adequately provided for any and all taxes, license fees, and other charges levied, assessed, or imposed upon, or which could result in a claim or lien upon, any of the Business Assets on the real estate.

5.7 **Absence of Litigation**. There are no suits, governmental proceedings, or litigation pending, or threatened against Seller which might materially affect the financial condition of Seller or the Business Assets or the Business; and no strike is pending or threatened against Seller by its employees or any labor union claiming or seeking to represent such employees, which would materially affect the Business Assets or the Business.

5.8 **Absence of Undisclosed Binding Contracts**. Buyer will not, by reason of the transfer of the Business Assets hereunder, become obligated under, liable under, or in any way responsible for any obligations or liabilities of Seller under any contract except the Leases and Contracts or except as otherwise specified herein unless Buyer should desire by written documents separate herefrom to become obligated or liable under such agreements.

5.9 **Absence of Binding Labor or Employment Agreements**. There are no written contracts of employment or of any other nature between Seller and any labor union or similar organization, corporate officer or employee or employees which would be binding upon Buyer after the acquisition by Buyer of the Business Assets hereunder, or which would result in claims (including without limitation claims for vacation pay or sick pay) or liens against Buyer, the Business Assets or the Business; and all oral contracts of employment are terminable on not more than thirty days' notice.

5.10 **Absence of Binding Fringe Benefit Programs**. Seller has no pension, bonus, profit sharing, health insurance, retirement or similar plans for officers and/or employees which plan or plans would in any manner become binding upon Buyer by reason of Buyer's acquisition of the Business Assets hereunder, or result in claims or liens against the Business or the Business Assets.

5.11 **Adequacy of Insurance**. All of the Business Assets are and will be adequately insured against fire and other casualty to the Closing Date, and valid policies therefor are and will be outstanding and fully in force, and the premiums thereon will be paid prior to the Closing Date.

5.12 **Validity of Leases**. The Leases are valid and binding under applicable law; are in full force and effect, and are not in default; will not as of the Closing Date be assigned by Seller to another, whether by pledge to secure indebtedness or otherwise; and are all of the leases used by the Seller in the conduct of the Business as currently conducted.

5.13 **Inventory**. Seller has good and marketable title to the Inventory free and clear of all liens, encumbrances and claims. The Inventory consists of items of a quality and quantity usable and saleable in the ordinary course of the Business, and the values of obsolete items and items below standard quality have been written down on its books of account to realizable market value, or adequate reserves have been provided therefor.

5.14 **Licenses and Permits; Compliance with Law**. As of the date hereof, the conduct of the Business is, and as of the Closing Date, it shall be, in full compliance with any and all federal, state, local, and other laws, statutes and ordinances, and regulations thereunder, and orders, pronouncements, regulations or other rules of any federal, state, local, or other governmental authorities to which federal, state, local, or other law grants the power to regulate or direct the conduct of the Business, including, without limitation, any and all federal, state and local environmental laws, regulations, permits or other requirements.

5.15 **No-Infringement of Patents, Copyrights, etc.** Seller has not infringed and is not infringing upon any patent, trade name, trademark, copyright, trade secret or other right of similar nature belonging to any other person, and Seller has not engaged and is not engaging in any form of unfair competition. The Seller owns or holds adequate licenses or rights to use all trademarks, trade names, copyrighted material, patents and other intangible personal property required for the conduct of its Business as operated by it, and such use does not conflict with any rights of others. Seller has never received a notice of infringement or other complaint that its operations traverse or infringe the rights of others under patents, trade secrets, trademarks, trade names, or copyrights or other similar rights.

5.16 **Conduct to Closing Date**. Between December 31, 2006 and the Closing Date, Seller has:

(a) Conducted the Business in the regular and ordinary course consistent with past practices, and to the extent consistent with the Business, use all reasonable efforts to preserve intact the present business organization;

(b) Maintained the books, accounts and records in the regular manner consistent with past practices;

(c) Not sold, leased or otherwise disposed of any of the Business Assets, except in the ordinary course of business;

(d) Not granted any increase in the compensation payable to any of its officers or employees or any substantial increase in any bonus, insurance, pension or other employee benefit plan, payment or arrangement made to, for or with any such officers or employees, except in the ordinary course of business and consistent with prior practices;

(e) Not created, assumed or incurred any mortgage, lien, pledge or other encumbrance of any kind in respect of the Business Assets;

(f) Not entered into any agreement that is material to Seller or the Business, except in the ordinary course of business;

(g) Not distributed or transferred any of the assets of the Business except in the ordinary course of business.

(h) Used its best efforts to preserve its business organization intact and maintained its relationships with suppliers, customers, lessees, creditors, employees, and others having business relations with it.

5.17 **Disclosure.** Seller has, in connection with the sale of the Business Assets to Buyer, disclosed to Buyer all of the material information concerning the Business Assets and the Liabilities being acquired and has not failed to disclose any information concerning such which, if known to Buyer, would materially adversely affect the decisions of Buyer with respect to this transaction.

5.18 **Condition of Assets.** Each of the tangible Business Assets is in good operating condition, normal wear and tear excepted, and repair and maintenance thereof has been performed on a current basis and in accordance with generally accepted industry standards.

5.19 **Environmental Matters.** All operations conducted by the Seller have been and are in compliance with all federal, state, and local statutes, rules, regulations, ordinances, permits, licenses, and authorizations relating to environmental compliance and control. No asbestos, asbestos containing material, or other hazardous or toxic wastes or substances are or have been located on the property used by Seller in its operations.

5.20 **ERISA Compliance.** Seller has not incurred any "accumulated funding deficiency" within the meaning of the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), any liability to the Pension Benefit Guaranty Corporation established under ERISA in connection with any employee benefit plan on any tax or penalty in respect of a transaction prohibited under ERISA or under Section 4975 of the Internal Revenue Code. There has been no "reportable event" with respect to any such plan as such term is defined in Section 4043 of ERISA or any notification by such corporation of any intent to institute proceedings to terminate any such plan. The Seller does not participate in, and it does not have any obligation to contribute to or any withdrawal liability with respect to, any "multiemployer plan" as such term is defined in Section 4001 of ERISA and has not received notice of the reorganization of any such plan.

5.21 **Additional Documents.** From time to time, at Buyer's request and expense (whether at or after the Closing Date, and without further consideration), Seller shall take such other action as Buyer reasonably may request to convey and transfer more effectively to Buyer the Business Assets to be sold to Buyer hereunder, and Seller hereby agrees to assist Buyer at Buyer's expense in collecting or obtaining access to such property.

5.22 **Survival of Warranties.** The foregoing representations and warranties are made by Seller and Shareholder with the knowledge and expectation that the Buyer is placing complete reliance thereon, and such representations and warranties shall continue to be true and correct up to and as of the Closing Date, and shall survive the Closing Date.

6. Warranties of Buyer. Buyer warrants and represents as follows:

6.1 **Organization and Good Standing.** Buyer is a corporation duly organized and in good standing under the laws of the State of Alabama and is in good standing in and duly qualified to do business in and under the laws of the State of Florida.

6.2 **Authorization.** Buyer is legally authorized to execute and perform its obligations under this Agreement, and the execution of this Agreement and the performance of Buyer's

obligations hereunder have been duly authorized by Buyer's Board of Directors, and no further authorization is necessary.

6.3 **Survival of Warranties.** The foregoing representations and warranties are made by the Buyer with the knowledge and expectation that the Seller is placing complete reliance thereon, and such representations and warranties shall continue to be true and correct up to and as of the Closing Date, and shall survive the Closing Date.

7. **Conditions to Buyer's Obligations**. The obligations of Buyer to this Agreement are, at the option of Buyer, subject to the following conditions, which conditions Seller hereby covenants to use its best efforts to fulfill (or where applicable to aid Buyer to fulfill):

7.1 **Truth of Seller's Warranties at Closing.** There shall not have been any material breach of the representations or warranties of Seller contained in this Agreement, and such representations and warranties shall continue to be true on Closing Date.

7.2 **Seller's Performance of Covenants.** Seller shall have performed and complied with all covenants required by this Agreement to be performed by Seller.

7.3 **Absence of Material Changes.** The Business and Business Assets shall not have been materially and adversely affected as a result of any event or transaction occurring from December 31, 2006 to the Closing Date; and there shall not have been from December 31, 2006 to the Closing Date any damage, destruction, or loss (whether or not covered by insurance) to or of the Business Assets, or labor or other trouble materially and adversely affecting the Business or Business Assets.

7.4 **Consents to Assignments of Leases.** Wherever necessary, consents to the assignments of the Leases hereunder from Seller to Buyer shall have been obtained by Seller in writing and furnished to Buyer.

7.5 **Consents to Assignments of Contracts.** Wherever necessary, consents to the assignments of the Contracts hereunder from Seller to Buyer shall have been obtained by Seller in writing and furnished to Buyer.

7.6 **Consents to Assignments of Licenses and Permits.** Wherever necessary, consents to the assignments of Licenses and Permits hereunder from Seller to Buyer shall have been obtained by Seller in writing and furnished to Buyer.

7.7 **Availability of Licenses, etc.** On or before the Closing Date, Buyer shall not have discovered that any license, permit, or other authorization required from any person, corporation, partnership, trust or other entity, or required under federal, state or local law for the conduct by Buyer of the Business as currently being conducted by the Seller, cannot be obtained by the Buyer.

7.8 **Seller's Certificate.** At Closing, Buyer shall have received from Seller a Certificate in form acceptable to Buyer signed by the President and Secretary of Seller to the effect that Seller's representations or warranties set forth herein continue to be true at the Closing Date, and that Seller has conducted the Business in the manner required by Section 5.16 "Conduct to Closing" up to the Closing Date.

7.9 **Copy of Seller's Shareholders' Directors' Resolutions.** On or before the Closing Date, Buyer shall have received from Seller a copy of resolutions of the Shareholders and the Board of Directors of Seller, in form acceptable to Buyer, certified by Seller's Secretary or Assistant Secretary, authorizing the transactions set forth in this Agreement.

7.10 **Receipt of Books and Records.** On or before the Closing Date, Buyer shall have received from Seller all of Seller's books and records pertaining to the Business and the Business Assets transferred hereunder.

7.11 **Real Estate.** The delivery of the Real Estate Lease and Purchase Agreement in executed form.

8. Conditions to Seller's Obligations. The obligations of Seller under this Agreement are, at the option of Seller, subject to the following conditions, which conditions Buyer hereby covenants to use its best efforts to fulfill, or where applicable to aid Seller to fulfill:

8.1 **Truth of Buyer's Warranties at Closing.** There shall not have been any material breach of the representations or warranties of Buyer contained in this Agreement, and such representations and warranties shall continue to be true on Closing Date.

8.2 **Buyer's Performance of Covenants.** Buyer shall have performed and complied with all covenants required by this Agreement to be performed by Buyer.

8.3 **Promissory Note.** The delivery of the Promissory Note in executed form.

8.4 **Real Estate.** The delivery of the Real Estate Lease and Purchase Agreement in executed form.

9. Covenant Not To Compete. For a period of 3 years after the Closing Date, neither Seller nor any Shareholder shall, directly or indirectly, within the city limits of Pensacola, Florida and a radius of 90 miles from said city limits in all directions, engage in any business (whether as owner, partner, lender, shareholder or employee, consultant, advisor or in any other manner whatsoever) which either (i) competes with the Buyer for the business of any customers of Seller with which Seller has conducted business at any time during the prior 12 months prior to Closing Date or (ii) is an existing or potential institutional wholesale produce customer of Seller or Buyer; provided, however, the provisions of this noncompete agreement shall cease to be applicable if Buyer defaults at any time in its obligations under this Agreement. Seller has the right to continue servicing current customer base, in the manner that business is conducted at the time of this agreement, of is Mobile operation. In the event a court of law in any jurisdiction should find the territorial limits or the time period of this covenant not to compete to be excessive or unlawful, Seller and Shareholder agree to abide by any reduction of such territorial limits or time period as the court may in its wisdom decree. Buyer shall be entitled to assign its rights and obligations under this covenant not to compete, and the covenant not to compete shall be binding upon and inure to the benefit and be enforceable by any successor or assigns of the parties. If Seller or Shareholder violates the restrictions set out in this covenant not to compete, the period during which this covenant not to compete shall apply shall be extended one (1) day for each day in which a violation occurs, and if suit is brought to enforce this covenant not to compete, and Buyer establishes one or more violations by Seller or Shareholder, Buyer shall be entitled to an injunction restraining Seller and Shareholder from further violations for a period of five (5) years as to all of the Shareholders from the date of the final decree less only such number of days that Seller and Shareholder have not violated this covenant not to compete. The purpose of this

provision is to prevent Seller and Shareholder from profiting from its/his own wrong if it/he violates this covenant not to compete.

10. **Breach of Covenants, Warranties or Representations: Indemnification.**

10.1 **Indemnification.** In the event that any covenant of any party in this Agreement or any document delivered pursuant to this Agreement shall be breached, or any representation or warranty made by any party in this Agreement or in any document delivered pursuant to this Agreement shall have been incorrect when made or when repeated at Closing, the breaching party or parties, jointly and severally, shall indemnify the other parties and hold them harmless in an amount equal to the loss, damage, and expense (including all reasonable attorney fees of such other parties) directly or indirectly attributable to such breach of covenant or such incorrect warranty or representation. Buyer may offset any liability of Seller or any Shareholder to Buyer arising under this Section 10 against any amounts owed by Buyer to Seller or any Shareholder pursuant to this Agreement, the Promissory Note, the Real Estate Lease and Purchase Agreement or any other agreement between Buyer and Seller or any Shareholder.

10.2 **Notice of Claim and Election to Participate.** Buyer will give the Seller or Shareholders prompt written notice of discovery of any breach of covenant or incorrect warranty or representation as to which the Seller or any Shareholder is alleged to be obligated to indemnify Buyer. Buyer, Seller, and Shareholders shall have the responsibility of contesting, defending, litigating, or settling any claim, including taxes, by any party other than the Buyer made against the Seller or Shareholders ("Third Party Claim") in respect of which such breach of covenant or incorrect representation or warranty is claimed. Seller and Shareholders shall have the right to be represented by counsel at their own expense in any such contest, defense, litigation, or settlement, but Buyer shall not be liable for any expense or legal fees incurred by Seller or Shareholders in any such participation. Each party shall have the exclusive right, in their discretion exercised in good faith and upon the advice of counsel, to settle any such Third Party Claim, either before or after the initiation of litigation, at such time and upon such terms as they would deem fair and reasonable if the loss resulting therefrom were to be paid by such party, provided that prior to any such settlement, written notice of their intention to settle shall be given to each other party.

10.3 **Claim by the Buyer.** If the claim in question involves a claim by the Buyer alleging that it is entitled to indemnification pursuant to this Agreement, then in the event the Seller or any Shareholder does not elect, within 30 days of the receipt of the original notice thereof, to contest such claim by written notice to the Buyer, then the Buyer shall be entitled to indemnity pursuant to the terms of this Agreement. If the Seller or any Shareholder elects to contest such claim by written notice to the Buyer, then the Buyer will be entitled to indemnity hereunder upon the final determination of such contest. All amounts payable pursuant to this Section 10 shall be determined taking into account any applicable insurance recoveries.

11. **Employee Matters.** Buyer shall not be obligated to employ any of the employees of Seller. As of the Closing Date, Seller will terminate the employment of those persons whom Buyer wishes to hire. Seller shall provide to Buyer at Closing such documents and other information relating to the termination of the employment of such employees as Buyer may request. Buyer shall employ all such persons as employees-at-will. Seller shall take whatever steps are necessary to pay or fund completely or reserve completely for any accrued benefits, where applicable, or vested accrued benefits for which Seller or any other person might have any liability whatsoever arising from any salary, wage, benefit, bonus, vacation pay, sick leave, insurance, employment tax or similar liability of Seller to any employee or other person (including, without limitation, any liability under employment contracts with Seller or any benefit or pension plan of Seller) allocable to services performed prior to the Closing

Date. Seller acknowledges that the purpose and intent of this covenant is to assure that Buyer shall have no liability whatsoever at any time with respect to any of Seller's employees or similar persons.

12. **Accounts Receivable and Accounts Payable.** It is agreed and understood that Buyer is not purchasing the Accounts Receivable and will not be responsible for collecting the Accounts Receivable and that Buyer is not assuming responsibility for the payment of any of Seller's accounts payable.

13. **Governing Law**. This Agreement shall be governed by the laws of the State of ~~Alabama.~~ FLORIDA.

14. **Taxes**. Any state or local sales or use taxes, or other taxes, if any, which may be payable by reason of the transfer of the Business Assets provided for in this Agreement shall be borne by Seller.

15. **Telephone**. The Seller shall authorize Buyer to use the telephone numbers presently used at the Business, and will sign such letters or other documents as may be necessary to submit to the telephone company for this purpose.

16. **Brokers**. There are no fees or commissions whatsoever due to any brokers whatsoever by reason of the execution or performance of this Agreement by Buyer and Seller.

17. **Assignability**. Except as otherwise provided in this Agreement, neither Seller nor Buyer shall be entitled to assign its rights and obligations under this Agreement, unless Seller or Buyer shall have first obtained the written consent of Buyer or Seller, as the case may be, to such assignment.

18. **Notices**. Any and all notices sent pursuant to the terms of this Agreement shall be sent registered or certified mail, addressed as follows:

TO THE SELLER:
Emerald Coast Finest Produce
3500 Dewey Rose Lane
Pensacola, Florida 32533

TO THE SHAREHOLDERS:
Preston Thompson.
3500 Dewey Rose Lane
Pensacola, Florida 32533

Connie Thompson.
3500 Dewey Rose Lane
Pensacola, Florida 32533

TO THE BUYER:
Adams Brothers Produce Company, Inc.
300 Union Hill Drive
Suite 300
Birmingham, Alabama 35209
Attention: Scott Grinstead

With a copy to:
Sirote & Permutt, P.C.
2311 Highland Avenue South

Birmingham, Alabama 35205
Attention: Richard Cohn, Esq.

19. **Effect of Agreement**. This Agreement sets forth the entire understanding of the parties and supersedes and cancels any other agreement, representation, communication or understanding, whether oral or written, between the parties hereto and relating to the transactions contemplated herein or the subject matter hereof. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successor and assigns of the parties, provided the assignment has been secured with the consent of the other party.

20. **Interpretation of Agreement**. All parties have participated fully in the negotiation and drafting of this Agreement. The Agreement has been prepared by all parties equally, and is to be interpreted according to its terms. No inference shall be drawn that the Agreement was prepared by or is the product of any particular party or parties.

21. **Access to Premises and Information**. Prior to Closing, Seller shall allow Buyer, and its authorized agents and representatives, to have full access to the premises, properties and books, files, and records of Seller at any reasonable time and in any reasonable manner and shall furnish Buyer with financial and operating data and other information with respect to the Business or Business Assets as Buyer shall reasonably request. Any investigation or inquiry made by Buyer pursuant to this Agreement shall not in any way affect or lessen the representations and warranties made by Seller in this Agreement.

22. **Waiver of Trial by Jury**. The parties to this Agreement desire to avoid the additional time and expense related to a jury trial of any disputes arising hereunder. Therefore, it is mutually agreed by and between the parties hereto, and for their successors and assigns, that they shall and hereby do waive trial by jury of any claim, counterclaim, or third-party claim, including any and all claims of injury or damages, brought by either party against the other arising out of or in any way connected with this Agreement and the relationship which arises herefrom. The parties acknowledge and agree that this waiver is knowingly, freely and voluntarily given, is desired by both parties, and is in the best interests of both parties.

23. **Arbitration**. Except as specifically set forth herein, the parties to this Agreement agree to resolve any and all disputes related in any manner whatsoever to this Agreement by binding arbitration in Tallahassee, FL. In the event that suit is brought pursuant to any law or statute which provides for allocation of attorney's fees and costs, the arbitrator shall have the power to allocate attorneys' fees and costs pursuant to the applicable law or statute. The parties to this Agreement agree that arbitration pursuant to this Agreement shall be in accordance with the applicable rules of the American Arbitration Association (hereinafter "AAA"). The parties, however, specifically agree that Buyer on the one hand, and Seller and Shareholder on the other hand, shall share equally the costs, fees, and expenses incurred by arbitration. The sole exception to this Section 21 involves suits brought on behalf of any party to this Agreement seeking a temporary restraining order, preliminary injunction and/or permanent injunction ("injunctive relief") based upon violation of the provisions of this Agreement by any party to this Agreement in the event there is immediate and irreparable injury, loss or damage. Both parties agree that neither shall seek monetary damages under this exception. However, in the event that the party or parties are successful in obtaining injunctive relief as defined herein, the other party or parties shall be liable for payment of the attorneys' fees, costs, and expenses incurred by the successful party in connection with obtaining injunctive relief. The Federal Arbitration Act shall govern the enforceability of any and all of the arbitration provisions of this Agreement.

24. **Counterparts**. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Business Assets Purchase Agreement to be executed on the 2nd day of June, 2007.

ADAMS BROTHERS PRODUCE COMPANY, INC.

By: Scott Grinstead
Scott Grinstead
Its Chief Executive Officer

(BUYER)

EMERALD COAST FINEST PRODUCE COMPANY, INC.

By: Connie Thompson
Connie Thompson,
Its President

By: Preston Thompson
Preston Thompson,
Its Vice President

(SELLER)

Connie Thompson
Connie Thompson

Preston Thompson
Preston Thompson

(SHAREHOLDERS)

**EXHIBIT A**

EXCLUDED ASSETS

1. The Real Estate (subject to separate purchase agreement)

2. The following vehicles:

   a.

   b.

   c.

3. Cash

4. Accounts receivable

5. One computer server, to be mutually agreed upon, which has on it a copy of the Seller's software and files.

**EXHIBIT B**
**REAL ESTATE LEASE AGREEMENT AND PURCHASE AGREEMENT**

SCHEDULE 1.4
CONTRACTS

**SCHEDULE 1.6**

INVENTORY

To be attached at Closing.

# SCHEDULE 1.7

## LEASES

**SCHEDULE 1.8**

LICENSES AND PERMITS

1. All licenses, permits, or other authorizations (and all of Seller's prepaid obligations thereunder) issued to Seller by any federal, state, local, or other governmental authority, or issued to Seller by parties other than federal, state, local, or other governments, and utilized in Emerald Coast Finest Produce Company, Inc.

**SCHEDULE 1.9**

LIABILITIES

Notes securing vehicles:

a.

b.

c.

**SCHEDULE 1.10**

PERSONAL PROPERTY

See attached schedule.

**SCHEDULE 3**

ALLOCATION OF PRICE

To be determined after closing

**SCHEDULE 5.3**

INFORMATION CONCERNING REVENUES OF SELLER

1. For the period from 1/1/06 to 12/31/06, the gross sales revenues of Seller were: $____________________.

2. For the period from 1/1/07 to 3/31/07, the gross sales revenues of Seller were: $____________________.